IN THE UNITED STATES DISTRICT COURT FOR THE
WESTERN DISTRICT OF MISSOURI
SOUTHWESTERN DIVISION

| | |
|---|---|
| JAMIE SMITH, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) No. 3:12-CV-05048-NKL |
| | ) |
| AS AMERICA, INC., d/b/a AMERICAN STANDARD BRANDS, | ) |
| | ) |
| Defendant. | ) |
| | ) |

## ORDER

In February 2011, Defendant A.S. America, Inc. ("American Standard") terminated Thomas Smith due to his number of accrued absences. Following his termination, Mr. Smith brought this action, alleging violation of the Family and Medical Leave Act ("FMLA"), 29 U.S.C. §§ 2601, *et seq.* The case was tried before the Court by agreement of the parties. The Court now makes the following findings of fact and conclusions of law.

**I.      Findings of Fact**

Thomas Smith began his employment at the Crane Plumbing plant in Nevada, Missouri on August 1, 2008. Sometime after Mr. Smith began working for Crane, the company, including the Nevada plant, was purchased by American Standard.[1] Throughout most of his employment, Mr. Smith worked as a "Kiln Utility," which was

---

[1] Parties do not dispute that American Standard meets the requirements to be a "qualified employer" under the FMLA.

1

his position at the time of his termination. The Kiln Utility job involved manually lifting porcelain toilet bowls, tanks, urinals and sinks from carts to put them into a kiln to be fired, and lifting them again to put them back onto the carts after they came out of the kiln. The average bowls weighed fifty pounds and the tanks about twenty-five pounds. When Mr. Smith was unable to lift, he could not do his job.

As of January 2011 the Nevada plant followed a "no fault" attendance policy whereby it assessed an employee one point each time he was absent or failed to work the majority of his shift. If the employee accumulated eight points in a rolling calendar year, American Standard terminated the employee. Absences covered by FMLA were not supposed to result in points.

As of January 2011, Mr. Smith worked the third shift, from 11:00 p.m. until 7:00 a.m. For third shift employees, American Standard defined the work day by the day on which the employee's shift ended, not when it started. For example, if Mr. Smith worked from 11:00 p.m. on Saturday, through 7:00 a.m. on Sunday, that period would be deemed his Sunday shift and his time record would reflect eight hours of work for Sunday. As of January 2011 Mr. Smith's "weekend" was from the end of third shift on Wednesday morning through the beginning of the shift on Friday evening.

Mr. Smith was absent for his shifts that ended on January 9, 10, and 11, 2011. On January 10, Mr. Smith saw nurse practitioner Deborah Asberry at Nevada Urgent Care. Asberry noted that Mr. Smith exhibited "chronic lumbar strain" in her record of the visit. On January 11 Mr. Smith submitted to American Standard an Application for FMLA Leave for the period January 9 through January 12, 2011. The Application was

2

accompanied by a Certification of Health Care Provider that had been completed by Asberry. The Certification noted two health problems: "cough due to acute sinusitus" and "lbp" (lower back pain)/"thoracolumbar spasm." With respect to Mr. Smith's lower back pain, Ms. Asberry noted on the Certification that:

- Mr. Smith would "need to have treatment visits at least twice per year due to the condition";
- Mr. Smith had been prescribed "medication, other than over-the counter medication," specifically NSAIDS (non-steroidal anti-inflammatory drugs) and m. (muscle) relaxants;
- Mr. Smith would be sent to PT (physical therapy) if the lower back pain continued or recurred;
- The condition could "cause episodic flare-ups periodically preventing [him] from performing his job functions" that she estimated might occur every three months and last three to five days per episode, requiring him to be absent from work.

This was the first time Mr. Smith had requested leave due to back pain while working at American Standard.

As of January 11, 2011 Human Resources Generalist Chris Morris was the local person responsible for administering the FMLA at American Standard's Nevada plant, with guidance from the corporate Director of Human Resources Randy Swander. Mr. Smith's Absentee Records for January 9 through 11 contain the notation "FMLA per C. Morris." The Absentee Records are filled out by an employee's supervisor on the date of an absence and are submitted to Human Resources, where the information is put into an

3

Excel spreadsheet. At his termination meeting in February 2011, American Standard gave Mr. Smith a printout from the Excel spreadsheet that indicated that his January absence has been recorded as FMLA leave. No one at American Standard ever asked Mr. Smith for additional information about his January application for FMLA leave.

On Saturday, February 5, 2011 Mr. Smith strained his back plowing snow. He reported for his shift at 11:00 p.m. that evening but found he could not perform the lifting required by his job. At about 1:30 a.m. on Sunday morning, February 6, he told his supervisor that he needed to leave due to back pain and left. Mr. Smith called the Nevada plant's "call in" line before 11:00 p.m. on February 6 and left a message that he would be absent for his February 7 shift. He stated that his absence should be covered by his previous FMLA application. On February 7, Mr. Smith talked to Jackie Nall, who had recently replaced Chris Morris as the Human Resources Generalist at the Nevada plant. Mr. Smith told Ms. Nall he had hurt his back plowing snow. He then told Ms. Nall that he was going to the doctor but that his absences should already be covered by the FMLA application that had been approved in January. Ms. Nall emailed a copy of Mr. Smith's January FMLA application to Randy Swander, noting that Mr. Smith thought the application covered his current absences as well because it referred to lower back pain.

Mr. Smith visited the Nevada Urgent Care clinic on February 7. His complaint was noted as "Slipped on ice, twisted back in fall." Mr. Smith was examined by Nurse Practitioner Kristin Robertson. Ms. Robertson directed Mr. Smith to take anti-inflammatory drugs and muscle relaxants (which he already had from his January visit) and advised that he would need physical therapy. Ms. Robertson wrote a note for Mr.

4

Smith to provide to American Standard. The note read: "Pt. seen in clinic 2/7/11. Please excuse from 2/8/11 & needs FMLA form to be completed for lumbar strain." Mr. Smith "called in" before 11:00 p.m. on February 7 to report that he would be absent for his February 8 shift. He again referred to his January request for intermittent FMLA leave.

On February 8, Mr. Smith went to the plant to submit Ms. Robertson's note. Ms. Nall met him and gave him documents assessing three points under American Standard's Absentee Policy for his leaving early from his February 6 shift and calling in for his February 7 and 8 shifts. According to American Standard these were his sixth, seventh and eighth points. Ms. Nall gave Mr. Smith a letter terminating his employment for accumulating eight points. Ms. Nall also gave Mr. Smith documents, dated February 8, purporting to deny the application for FMLA leave Mr. Smith submitted on January 10 which had already been granted. Mr. Smith protested that his absences should be covered by FMLA leave.

On February 11 Mr. Smith submitted a new Application for FMLA Leave for his February absences. On the Certification of Health Care Provider accompanying the new application, Nurse Practitioner Robertson noted:

- "Thoracolumbar spasm [treated with] NSAIDS and muscle relaxants";
- Mr. Smith was unable to perform his job functions due to the condition;
- Mr. Smith had been prescribed medication and referred to physical therapy;
- Mr. Smith would need follow up treatment appointments for the condition;
- The condition was likely cause episodic flare-ups periodically preventing him from performing his job functions.

5

The Certification stated that the approximate date the condition commenced was February 7 and estimated that the current period of incapacity would last through February 9. American Standard did not request additional information from Mr. Smith concerning his February 11 application.

Following his termination, Mr. Smith began looking for jobs, submitting approximately three to four applications per week. Mr. Smith was arrested for domestic assault on July 13, 2011, and spent time in jail. He stopped applying for jobs in late 2012 and submitted no employment applications in 2013 because he was earning enough money "junking" and "salvaging" to pay his bills.

On March 3, 2014, Mr. Smith passed away. On April 17, 2014, Mr. Smith's wife Jamie Smith filed an Application for Letters of Administration with the 28th Judicial Circuit Court, Probate Division in Vernon County, Missouri (the "Probate Court"). In the Application for Letters of Administration, Ms. Smith attested that Mr. Smith has no real property and that the only personal property Mr. Smith has is this lawsuit against Defendant. Ms. Smith attested that Mr. Smith's estate had a total value of $41,000. Based on Ms. Smith's sworn affidavit valuing Mr. Smith's estate at $41,000, the Probate Court granted Ms. Smith's Application for Letters of Administration on April 21, 2014, and allowed Ms. Smith to serve as Mr. Smith's personal representative. Specifically, the Probate Court granted Ms. Smith the right "to take possession and control of all [of Mr. Smith's] personal property . . . with full power and authority to secure and dispose of said property . . . and collect all moneys due . . . and in general to do and perform all other acts and things which are required by law." The probate court

published the Notice of the Letters of Administration on April 22, 2014, in The Nevada Daily Mail to put any and all creditors on notice. The probate proceedings regarding Mr. Smith's estate are now nearing a close. Ms. Smith was substituted for Mr. Smith as Plaintiff in this case on July 7, 2014.

## II. Discussion

### A. FMLA Interference Claim

Plaintiff argues that she is entitled to damages due to American Standard's wrongful interference with Mr. Smith's leave rights pursuant to 29 U.S.C. § 2615. The FMLA provides that "an eligible employee shall be entitled to a total of 12 workweeks of leave during any 12-month period . . . [b]ecause of a serious health condition that makes the employee unable to perform the functions of the position of such employee." *Id.* at § 2612(a)(1). In order to prove an interference claim, an "employee must show only that he or she was entitled to the benefit denied." *Stallings v. Hussmann Corp.*, 447 F.3d 1041, 1050 (8th Cir. 2006) (quotation omitted).

The FMLA defines a "serious health condition" as "an illness, injury, impairment, or physical or mental condition that involves – (A) inpatient care in a hospital, hospice, or residential medical care facility; or (B) continuing treatment by a health care provider." 29 U.S.C. § 2611(11). Plaintiff claims that Mr. Smith had a serious health condition necessitating continuing treatment by a health care provider at the time of his termination. Specifically, Plaintiff claims Mr. Smith qualified for FMLA leave based on one or both of the following:

7

(1) Incapacity and treatment. A period of incapacity of more than three consecutive, full calendar days, and any subsequent treatment or period of incapacity relating to the same condition, that also involves . . . [t]reatment by a health care provider on at least one occasion, which results in a regimen of continuing treatment under the supervision of the health care provider. 29 C.F.R. § 825.115(a).

(2) Chronic conditions. Any period of incapacity or treatment for such incapacity due to a chronic serious health condition. A chronic serious health condition is one which: (1) Requires periodic visits (defined as at least twice a year) for treatment by a health care provider, or by a nurse under direct supervision of a health care provider; (2) Continues over an extended period of time (including recurring episodes of a single underlying condition); and (3) May cause episodic rather than a continuing period of incapacity (e.g., asthma, diabetes, epilepsy, etc.). *Id.* at § 825.115(c).

If Mr. Smith's February 2011 absences were caused by a serious health condition as defined by the FMLA, he should not have been assessed points for his February 6, 7, and 8 absences under the attendance policy, and is entitled to recover damages for American Standard's wrongful interference with his leave rights.

Plaintiff argues that his February 2011 absences qualified for FMLA leave as both a period of incapacity and treatment and as a chronic condition. The Court agrees.

Mr. Smith incurred his back injury on February 5 after straining his back plowing snow. After arriving at work for his shift that evening and discovering that he could not do the lifting required by his job he informed his supervisor that he needed to leave due to back pain and left. Prior to his next shift, he called to inform American Standard that he would be absent, referencing his January FMLA application for leave due to back pain. The following day, he called the Human Resources representative Jackie Nall and informed her that he would be absent from his February 8 shift because he had injured his

back plowing snow.  He further stated that he would be going to the doctor.  Later that day, he saw a nurse practitioner, who gave him a note for American Standard that read: "Pt. seen in clinic 2/7/11.  Please excuse from 2/8/11 & needs FMLA form to be completed for lumbar strain."  On February 8, Mr. Smith went to the plant to submit the note.  Ms. Nall met him and gave him documents terminating his employment for accumulating eight points under the Attendance Control Policy, including three points for his February 6, 7, and 8 shifts.

On February 11, after his termination, Mr. Smith submitted a new Application for FMLA Leave for his February absences.  The certification form accompanying the new application noted that he was being treated with muscle relaxants and had been referred to physical therapy, had been unable to perform his job functions for a few days, and needed follow up treatment appointments for his condition.  The certification form approximated his period of incapacity as lasting from February 7 through February 9.

American Standard argues that because the certification form listed Mr. Smith's incapacity as lasting for only three days, Mr. Smith did not meet the qualifications for FMLA leave for incapacity and treatment, which requires a period of incapacity lasting longer than three full days.  American Standard argues that this conclusively shows that Mr. Smith's absences did not qualify for FMLA leave pursuant to 29 C.F.R. §§ 825.305 and 825.306. Section 825.305 permits an employer to require a certification form issued by a health care provider to evaluate the employee's qualification for FMLA leave. Section 825.306 sets out the content that may be required by the form, which includes "[t]he approximate date on which the serious health condition commenced, and its

9

probable duration." American Standard contends that Mr. Smith provided it a complete certification form, which noted that his incapacity would last for a period of three days, and that it relied on that representation in denying Mr. Smith's application for FMLA leave.

While American Standard was certainly entitled to require that Mr. Smith provide a certification form regarding his purported incapacity, American Standard has cited no legal basis for its contention that it was entitled to rely on the information in the certification form to the *exclusion* of all other evidence it had at the time. American Standard was aware that Mr. Smith claimed to have injured his back plowing snow on February 5. After leaving early from his shift that night, he called in prior to his next two shifts, informing American Standard that he would not be in due to back pain and that he had submitted an FMLA application for absences due to back pain in January, which he believed would cover his February absences. Based on the information Mr. Smith provided American Standard, it should reasonably have concluded, at a minimum, that Mr. Smith hurt his back sometime on February 5, and that his period of incapacity lasted at least through February 9, as indicated on the certification form. Nothing on the certification form indicates that the health care provider is expected to provide exact dates of the commencement and conclusion of a patient's incapacity. The form requests the "approximate date the condition commenced," and "probable duration of the condition," and for the provider to "estimate the beginning and ending dates for the period of incapacity." Mr. Smith saw the nurse practitioner for the first time on February 7, the Monday following his Saturday injury. The certification form presumably lists

February 7 as the date of the commencement of Mr. Smith's condition as that was the first day he was seen for his back pain following his injury. American Standard was not entitled to rely on this approximation to the exclusion of the other evidence it had, which clearly indicated that Mr. Smith's period of incapacity commenced on February 5. Furthermore, American Standard fired Mr. Smith even before it received the February 11 certification form from Mr. Smith even though it knew it had granted Mr. Smith FMLA leave for a back injury the previous month. The Court finds disingenuous American Standard's claim that it was relying on the February certification form to deny Mr. Smith FMLA leave when it had granted FMLA leave the previous month on the basis of a similar certification form.

Mr. Smith's situation is distinguishable from cases American Standard cites to support the proposition that American Standard was entitled to rely only on information provided in a certification form. For example, American Standard relies heavily on *Hansler v. Lehigh Valley Health Network*. 2014 WL 1281132 (E.D. Penn, March 28, 2014). In *Hansler*, the plaintiff experienced shortness of breath, nausea, and vomiting. *Id.* at *3. She visited her doctor approximately two weeks following the commencement of her symptoms, and the doctor noted on her FMLA request form that she would require intermittent leave two times per week for approximately one month. *Id.* After her termination, the plaintiff brought a claim for FMLA interference, alleging that she suffered from a serious health condition. *Id.* at *6. The court found that the employer was entitled to rely on the certification form's "negative certification" to deny the plaintiff's FMLA request premised on a chronic condition. The court concluded that

11

because a chronic serious health condition must be expected to last over an extended period of time and "approximately one month" is not an extended period of time within the meaning of the FMLA, "plaintiff's certification demonstrated that she did not . . . qualify for FMLA leave based upon a chronic serious health condition." *Id.* at *11.

Unlike the plaintiff in *Hansler*, Mr. Smith alleged a serious health condition based on both a period of incapacity and treatment and a chronic condition. The certification form in *Hansler* clearly indicated that she did not suffer from a chronic condition, as an approximate duration of one month is insufficient to demonstrate a chronic condition. *See id.* at *9 ("The U.S. National Center for Health Statistics *defines chronic condition as one of three months' duration or longer.*" (emphasis in original)). Mr. Smith's certification form did not indicate that the duration of his condition was insufficient to qualify for leave, particularly in light of the evidence American Standard had indicating that Mr. Smith injured himself on February 5. The form indicated that Mr. Smith's condition was expected to last at least three days, from February 7 through 9. This approximation did not result in a clear "negative certification," such that American Standard was entitled to rely on the dates set out in the certification form to the exclusion of all other evidence it had of Mr. Smith's condition. *Cf. Stoops v. One Call Communications, Inc.*, 141 F.3d 309 (7th Cir. 1998) (employer was entitled to rely on negative certification where the doctor "indicated that [plaintiff] suffered from a chronic serious health condition but that he was not presently incapacitated and would not have to work intermittently or on a reduced work schedule"); *cf. Woida v. Genesys Regional Medical Center*, 4 F.Supp.3d 880 (E.D. Mich. 2014) (employer was entitled to rely on a

12

certification form in denying FMLA leave where the certification form stated plaintiff would have "up to one episode monthly" of her chronic condition, and plaintiff reported multiple episodes without an additional certification form). American Standard possessed significant evidence that Mr. Smith's period of incapacity lasted longer than three days, and in light of that evidence could not deny Mr. Smith's FMLA request on the basis of approximations in a certification form, that it did not receive until after it terminated Mr. Smith, knowing that he was claiming FMLA leave for his absence.

Alternatively, Mr. Smith was entitled to leave based on a chronic condition. Mr. Smith's January application for FMLA leave stated that he would need treatment visits at least twice per year for his back, he had been prescribed prescription drugs, he would be sent to physical therapy if his pain continued, and his condition could cause periodic flare-ups approximately once every three months for three to five days per episode. His February application for FMLA leave noted that Mr. Smith was following a similar drug treatment plan, he had been referred to physical therapy, he needed follow up treatment appointments, and his condition was likely to cause episodic flare-ups. These statements clearly indicate that Mr. Smith had a back condition that would require periodic visits for treatment by a health care provider and cause episodic periods of incapacity in accordance with 29 C.F.R. § 825.115(c).

The certification forms also indicate that Mr. Smith's condition was likely to continue over an extended period of time. The February application notes that Mr. Smith's condition will cause episodic flare-ups periodically preventing him from performing his job approximately once every three months for two to three days. The

January application made a similar notation and stated that Mr. Smith would need intermittent muscle relaxants and anti-inflammatories.

American Standard argues that back problems cannot be considered chronic unless they have existed for a number of years. Though citing a series of cases in which plaintiffs' back problems were considered chronic when exhibited over a period of years, American Standard points to no rule of law stating that back problems must be exhibited over an extended period of time before they may qualify as a chronic condition. Moreover, American Standard's position is logically incorrect. As with diabetes and asthma, which American Standard concedes may be considered chronic immediately upon diagnosis, chronic back problems undoubtedly have a starting point. Where a medical professional diagnoses a patient with back problems predicted to recur over an extended period of time, those back problems may qualify as chronic under the FMLA. Here, Mr. Smith's certification form stated that he would have ongoing back problems predicted to recur once every three months. That Mr. Smith had no record of treatment for back problems prior to January 2011 is irrelevant to whether he was expected to have problems in the future.[2]

American Standard further argues that the undisputed evidence indicates that Mr. Smith's February injury was caused by his fall plowing snow and therefore was unrelated

---

[2] American Standard also argues that because Mr. Smith received no treatment for back problems after February 2011, his condition cannot be considered chronic. The Court declines to speculate about whether Mr. Smith's back pain improved after he stopped lifting fifty pound toilets repeatedly every night. Mr. Smith's certification forms from January and February 2011 clearly state that his health care provider expected him to suffer from ongoing back problems, which is sufficient to deem Mr. Smith's January and February absences occurrences of a chronic condition covered by the FMLA.

14

to any chronic back problems. American Standard cannot make this argument, however, while simultaneously arguing that it was entitled to rely on the February certification form and entirely disregard the information it had that Mr. Smith's February 5 fall caused his February absences, resulting in a period of incapacity longer than three days. Based on the evidence American Standard had on February 8 when it terminated Mr. Smith, American Standard should have concluded that Mr. Smith's February absences resulted either from a period of incapacity, or a flare-up of a chronic condition.

### B. Good Faith Defense

The FMLA provides that an employee proving a violation of the Act may recover both compensatory damages and statutory interest, as well as "an additional amount as liquidated damages equal to the sum of [compensatory damages and statutory interest]." 29 U.S.C. § 2617(a)(1)(A)(iii). However, if the employer can prove that the violation was "in good faith and that the employer had reasonable grounds for believing that [its actions] [were] not a violation," the court may choose to reduce or not award liquidated damages. *Id.*

American Standard has not met its burden to prove it had reasonable grounds to believe that the FMLA did not cover Mr. Smith's absences in February 2011. The February certification form provided to American Standard listed Mr. Smith's period of incapacitation as lasting for three days with expected additional periods of incapacity during the year. American Standard had granted Mr. Smith FMLA leave based on a similar certification form the previous month and both certifications related to back pain. It also knew Mr. Smith's absence from work in February 2011 was because of back

15

Case 3:12-cv-05048-NKL   Document 144   Filed 01/09/15   Page 15 of 20

problems. He told them this and indicated he thought the absences were covered by the January FMLA certification which indicated that continuing absences would be expected as a result of Mr. Smith's back problem. Nonetheless, American Standard terminated him immediately, not even waiting to get the application for FMLA leave. It also attempted to reject the January application for FMLA leave even though the record clearly shows Mr. Smith's January FMLA application had already been granted. It is clear that American Standard did not want an employee with a back problem and did not in good faith consider the evidence concerning the FMLA request at all. Further, American Standard's decision to grant the January request for FMLA leave on almost identical grounds is further evidence that it was not reasonable for it to deny the February FMLA request. It therefore cannot meet its burden to show that it had reasonable grounds to believe that the FMLA did not cover Mr. Smith's absences.

### C. After Acquired Evidence Defense

American Standard contends that the after acquired evidence doctrine limits Plaintiff's recovery in this case. Under this doctrine, if an employer discovers evidence of wrongdoing on the part of the employee that would have resulted in a legitimate discharge, the employee's award for back-pay may be limited to the period between the unlawful termination and the employer's discovery of this evidence. *McKennon v. Nashville Banner Pub. Co.*, 513 U.S. 352, 362 (1995). On this issue, "the employer bears a 'substantial burden' and must show that such a firing would have taken place as a matter of 'settled' company policy." *Waag v. Thomas Pontiac, Buick, GMC, Inc.*, 930 F. Supp. 393, 408 (D. Minn. 1996) (quoting *Welch v. Liberty Mach. Works, Inc.*, 23 F.3d

1403, 1406 (8th Cir. 1994), *abrogated on other grounds by McKennon*, 513 U.S. at 362-63). "The court must look to the employer's actual employment practices and not merely the standards articulated in its employment manuals, for things are often observed in the breach but not in the keeping." *Sellers v. Mineta*, 358 F.3d 1058, 1064 (8th Cir. 2004).

American Standard contends that had Mr. Smith been employed by American Standard in 2011 when Mr. Smith was arrested for assault, he would have been terminated for accruing too many absences and violating the attendance policy. Mr. Smith was arrested on July 13, 2011. Parties agree that Mr. Smith was in jail at least through July 18. Parties differ as to whether Mr. Smith was released on July 19 or 20.

According to the attendance policy, employees who accrue eight or more absences in a rolling year will be terminated. A significant number of employees have been terminated in accordance with this attendance policy. In the rolling year prior to July 13, 2011, Mr. Smith had accrued three absences outside of his January and February absences. American Standard contends that Mr. Smith's January absences were not covered by the FMLA and resulted in Mr. Smith being assessed three points. However, Mr. Smith's January absences were approved by the Nevada Human Resources representative Chris Morris in January as being covered by the FMLA. American Standard could not retroactively revoke FMLA coverage thereafter. The Court has also concluded that Mr. Smith's February absences should have been granted FMLA coverage. Thus, American Standard must prove that Mr. Smith would have accrued five or more absences as a result of his arrest in order for Plaintiff's damages to be limited by this after acquired evidence doctrine.

17

Case 3:12-cv-05048-NKL   Document 144   Filed 01/09/15   Page 17 of 20

Both parties agree that Mr. Smith would have received four points for being absent from his July 16, 17, 18, and 19 shifts. However, Plaintiff contends Mr. Smith was released from jail on July 19, which would have been in time for him to work his July 20 shift, which began at 11:00 p.m. on July 19. American Standard argues that Mr. Smith was not bailed out until July 20, which would have resulted in his eighth point accrued under the attendance policy and Mr. Smith's termination.

The employer has the burden of proof in asserting the after acquired evidence doctrine. In order to successfully utilize the doctrine, the employer must "establish that the wrongdoing was of such severity that the employee in fact would have been terminated on those grounds alone." *Id.* at 362-63; *Harris v. Chand*, 506 F.3d 1135, 1139 (8th Cir. 2007). In light of the court records [3] which show Mr. Smith posted bond on July 20, 2011, the weight of the evidence supports the conclusion that Mr. Smith remained in jail the night of July 19 and would therefore have incurred his eighth attendance point for missing his July 20 shift resulting in his termination by American Standard. While Plaintiff presented evidence that Mr. Smith acquired the money for bond on July 19 and was released on July 19, a contemporaneously prepared court record is entitled to more weight than Ms. Smith's memory of the event, particularly in light of the very technical nature of the information, making it less likely to be accurately remembered years later.

---

[3] While the actual court records are not in evidence, the parties stipulated to testimony concerning the content of the records.

18

Given the evidence that American Standard employees were regularly terminated for violations of the attendance policy, Plaintiff's damages must be cut off as of July 20, 2011.

**D. Damages[4]**

As a result of American Standard's violation of the FMLA, Plaintiff is entitled to recover "any wages, salary, employee benefits, or other compensation denied or lost to such employee by reason of the violation," along with "the interest on the amount . . . calculated at the prevailing rate." 29 U.S.C. § 2617(a)(1)(A)(i). "Other compensation" has been interpreted to include overtime pay, which is often awarded in connection with violations of employment laws. *See Pagan-Colon v. Walgreens of San Patricio, Inc.*, 697 F.3d 1, at *11-12 (1st Cir. 2012) (citing numerous cases awarding employees overtime when employers violated federal employment laws).

Plaintiff is entitled to damages from February 8, 2011, the date of his termination, through July 20, 2011, the date on which Mr. Smith would have been terminated for violating the attendance policy, had he still been employed.[5] She is entitled to recover for Mr. Smith's regular and overtime wages, along with holiday pay. Plaintiff has presented no evidence that Mr. Smith incurred any costs due to his lost benefits prior to July 20, 2011. As discussed above, American Standard's violation was not in good faith, and therefore the Court finds she is entitled to liquidated damages in addition to her actual damages.

---

[4] In light of the amount of Plaintiff's damages award, American Standard's argument regarding judicial estoppel is moot.

[5] This entitles Plaintiff to pay for 22 weeks of lost employment.

Mr. Smith's rate of pay at the time of his termination was $15.35 per hour. He worked forty hours per week at his regular rate of pay. According to the CBA, employees in Mr. Smith's job classification were paid time and a half for overtime. Mr. Smith worked an average of 1.74 hours per week in overtime his last year working for American Standard. Employees in Mr. Smith's job classification were paid triple time for working on designated holidays. Between February 8, 2011, and December 31, 2012, Mr. Smith would have worked three holidays. Mr. Smith earned $2,693 in replacement earnings in 2011. Thus, Plaintiff is entitled to actual damages in the amount of $13,865.84, plus statutory interest.[6] Plaintiff is also entitled to liquidated damages in an equal amount.

## III. Conclusion

For the reasons set forth above, the Court finds in favor of Plaintiff on her FMLA interference claim, and awards her damages in the amount of $27,731.68, plus statutory interest.

                                         s/ Nanette K. Laughrey
                                         NANETTE K. LAUGHREY
                                         United States District Judge

Dated: January 9, 2015
Jefferson City, Missouri

---

[6] This amount was calculated as follows: 40 hours per week at a rate of $15.35 per hour plus 1.74 hours per week at a rate of $23.03 per hour, multiplied by 22 weeks; plus an additional $30.70 per hour for 3 holidays. Subtracted from this amount were Mr. Smith's replacement earnings. His replacement earnings were $1,260.55, which equals his average replacement income over his 47 weeks of unemployment in 2011, multiplied by the 22 weeks for which Plaintiff is due compensation.